## COPE *v.* COPE.

APPEAL FROM THE SUPREME COURT OF THE TERRITORY OF UTAH.

No. 1327. Submitted December 22, 1890. — Decided January 19, 1891.

The statute of Utah of 1852, (Compiled Laws of Utah, 1876, sec. 677,) which provides that "illegitimate children and their mothers inherit in like manner from the father, whether acknowledged by him or not, provided it shall be made to appear to the satisfaction of the court that he was the father of such illegitimate child or children," was an act of legislation within the powers conferred upon the Territorial legislature by Congress by the act of September 9, 1850, 9 Stat. 453, c. 51, § 6; and was not abrogated, annulled or repealed by the act of July 1, 1862, 12 Stat. 501, c. 126, to prevent the practice of polygamy and annulling certain acts of that Territory.

The distribution of and the right of succession to the estates of deceased persons are matters exclusively of State cognizance, and may be dealt with by a Territorial legislature as it sees fit, in the absence of a prohibition by Congress.

Annulments of statutes by implication, like repeals by implication, are not favored by the courts.

No statute of a Territory will be declared void because it may indirectly, or by a construction which is possible but not necessary, be repugnant to an act of Congress annulling legislation of the Territory; but such a result must be direct and proximate in order to invalidate the statute.

The several acts of Congress respecting polygamy considered.

THIS was an appeal from a decree of distribution, originally pronounced by the Probate Court of Salt Lake County, affirmed by the District Court of the Third Judicial District of Utah, and again by an equal division of the Supreme Court of the Territory.

The sole question presented for consideration was, whether George H. Cope, the illegitimate child of Thomas Cope, was, under the facts of the case, the heir of Thomas Cope, deceased. The finding of facts, so far as the same are material, was as follows:

1. That Thomas Cope, deceased, died at Salt Lake County, Utah Territory, intestate, on the — day of August, 1864, leaving certain real estate therein, the description of which is immaterial.

2. That said Thomas Cope left at the time of his death surviving him, Janet Cope, his lawful wife, Thomas H. Cope, his only legitimate son, and George H. Cope, his illegitimate son by Margaret Cope, his polygamous or plural wife, and that the marriage of the said deceased with Margaret Cope was contracted while the said Janet Cope was the living and undivorced wife of said deceased.

And as conclusions of law the court found :

1. That the sole heirs-at-law of said Thomas Cope, deceased, are Janet Cope and Thomas H. Cope, who are alone entitled to share in the distribution of the estate of said Thomas Cope, and that all the real estate above mentioned descended to and vested in said Janet Cope and Thomas H. Cope, subject to the administration upon such estate.

2. That the said George H. Cope is not an heir of said Thomas Cope, deceased, and not entitled to any share of said Thomas Cope's estate.

*Mr. J. G. Sutherland* for appellant.

*Mr. R. N. Baskin* for appellees.

MR. JUSTICE BROWN, after stating the case, delivered the opinion of the Court.

The appellant, George H. Cope, who is admitted to be the illegitimate child of Thomas Cope, by Margaret Cope, his polygamous wife claims the right to inherit a share of his father's estate under a Territorial statute of Utah, enacted in 1852, which provided as follows: "Section 25. Illegitimate children and their mothers inherit in like manner" [as legitimate] "from the father, whether acknowledged by him or not, provided it shall be made to appear to the satisfaction of the court that he was the father of such illegitimate child or children." Compiled Laws of Utah, 1876, § 677.

While this statute is an innovation upon the common law, and in some particulars a novelty in legislation, we perceive no objection to its validity. By section 6 of the act of September 9, 1850, 9 Stat. 453, 454, establishing a Territorial government for Utah, it is provided: "That the legislative power of said Territory shall extend to all rightful subjects of legislation, consistent with the Constitution of the United States and the provisions of this act; but no law shall be passed interfering with the primary disposal of the soil; no tax shall be imposed upon the property of the United States; nor shall the lands or other property of non-residents be taxed higher than the lands or other property of residents. All the laws passed by the legislative assembly and governor shall be submitted to the Congress of the United States, and, if disapproved, shall be null and of no effect" With the exceptions noted in this section, the power of the Territorial legislature was apparently as plenary as that of the legislature of a State. *Maynard* v. *Hill*, 125 U. S. 190, 204. The distribution of and the right of succession to the estates of deceased persons are matters exclusively of State cognizance, and are such as were within the competence of the Territorial legislature to deal with as it saw fit, in the absence of an inhibition by Congress. Indeed, legislation of similar description is by no means unprecedented. By the laws of many States natural children are permitted to inherit from the mother, and also from the father in case of the after marriage of their parents, or where there are no lawful children, or where an adoption is made in due form, or where recognition is made by will. And if the

question of parentage be satisfactorily settled, there would seem to be power in the legislature to endow even the children of an adulterous intercourse with inheritable blood from the father.

Legislation admitting illegitimate children to the right of succession is undoubtedly in derogation of the common law, and should be strictly construed, and hence it has generally been held that laws permitting such children, whose parents have since married, to inherit, do not apply to the fruits of an adulterous intercourse. *Sams* v. *Sams' Executors*, 85 Kentucky, 396.

But, while it is the duty of the courts to put a construction upon statutes, which shall, so far as possible, be consonant with good morals, we know of no legal principle which would authorize us to pronounce a statute of this kind, which is plain and unambiguous upon its face, void, by reason of its failure to conform to our own standard of social and moral obligations. Legislatures are as competent as courts to deal with these subjects, and, in fixing a standard of their own, are beyond our control. Thus in *Brewer* v. *Blougher*, 14 Pet. 178, 198, it was said by Mr. Chief Justice Taney, speaking for this court, that the expediency and moral tendency of a similar law was a question for the legislature and not for this court; and it was held in that case that a statute of Maryland, endowing illegitimate children with inheritable blood, applied to such as were the offspring of an incestuous connection.

It is true that the peculiar state of society existing at the time this act was passed, and still existing in the Territory of Utah, renders a law of this kind much wider in its operation than in other States and Territories; but it may be said in defence of this act that the children embraced by it are not responsible for this state of things, and that it is unjust to visit upon them the consequences of their parents' sins. To recognize the validity of the act is in the nature of a punishment upon the father, whose estate is thus diverted from its natural channel, rather than upon the child; while to hold it to be invalid is to treat the child as in some sense an outlaw and a *particeps criminis.*

It is contended by respondents, however, that, even conceding the validity of this statute, it was abrogated and annulled by the anti-polygamy Act of Congress of July 1, 1862, 12 Stat. 501, c. 126, the second section of which annuls by title the ordinance for the incorporation of the Mormon Church, and then adds: "and all other acts and parts of acts heretofore passed by the said legislative assembly of the Territory of Utah, which establish, support, maintain, shield or countenance polygamy, be, and the same hereby are, disapproved and annulled : *Provided,* That this act shall be so limited and construed as not to affect or interfere with the right of property legally acquired under the ordinance heretofore mentioned, nor with the right ' to worship God according to the dictates of conscience,' but only to annul all acts and laws which establish, maintain, protect, or countenance the practice of polygamy," etc. As this act was passed before the death of Thomas Cope, and of course before descent cast upon his children, it applies to this case if the argument of respondents be sound. The question is then presented, does the Territorial act of 1852 establish, support, maintain, shield or countenance polygamy? It clearly does not establish, support or maintain it. Does it shield or countenance it? It does not declare the children of polygamous marriages to be legitimate; in fact, it treats them as illegitimate, or rather, it does not, except by indirection or inference, mention them at all; but it puts all illegitimate children, whether the fruits of polygamous or of ordinary adulterous or illicit intercourse, upon an equality and vests them with inheritable blood.

Nothing is better settled than that repeals, and the same may be said of annulments, by implication, are not favored by the courts, and that no statute will be construed as repealing a prior one, unless so clearly repugnant thereto as to admit of no other reasonable construction. *McCool* v. *Smith,* 1 Black, 459 ; *Bowen* v. *Lease,* 5 Hill, 221 ; *Ex parte Yerger,* 8 Wall. 85, 105 ; *Furman* v. *Nichol,* 8 Wall. 44 ; *United States* v. *Sixty-seven Packages,* 17 How. 85 ; *Red Rock* v. *Henry,* 106 U. S. 596.

In order to subject the Territorial act of 1852 to the annul-

ling clause of the act of Congress, its tendency to shield or countenance polygamy should be direct and unmistakable. No law will be declared void because it may indirectly, or by a possible, and not a necessary, construction be repugnant to an annulling act. Its direct and proximate results are alone to be considered. While, as before observed, the act may have been passed in view of the existing state of things, and as an indirect method of recognizing the legitimacy of polygamous children, it has no tendency in itself to shield or countenance polygamy so far as it applies to children. Legislation for the protection of children born in polygamy is not necessarily legislation favorable to polygamy. There is no inconsistency in shielding the one and in denouncing the other as a crime. It has never been supposed that the acts of the several States legitimating natural children, whose parents intermarry after their birth, had the slightest tendency to shield or countenance illicit cohabitation, but they were rather designed to protect the unfortunate children of those who were willing to do all in their power towards righting a great wrong. So, if the act in question had been passed in any other jurisdiction, it would have been considered as a perfectly harmless, though possibly indiscreet exercise of the legislative power, and would not be seriously claimed as a step towards the establishment of a polygamous system.

As this act annuls only such Territorial laws as shield or countenance polygamy, if we sustain the construction urged by the respondents here, it must necessarily follow that the children of polygamous marriages would be deprived of their power to inherit from the father, while the offspring of other illicit relations would be left to inherit under the act. This would seem to be at war with the intent of the legislature.

But whatever doubts there may be regarding the proper construction of this act, we think they are dispelled by a scrutiny of the subsequent legislation upon the same subject. In 1876 the legislature of Utah, being evidently in some doubt as to the proper interpretation of the Congressional act of 1862, passed another act declaring that "every illegitimate child is, in all cases, an heir to its mother. It is also heir to

its father when acknowledged by him." This was followed March 22, 1882, by an act of Congress, commonly known as the Edmunds law, 22 Stat. 30, c. 47, which, while providing for further punishment for polygamy and its accompanying evils, in section 7 expressly legitimates the issue of polygamous or Mormon marriages born prior to January 1, 1883. If the Territorial act of 1852 be open to the charge of shielding or countenancing polygamy, much more so is this act, which not only admits polygamous children to the right of inheritance, but actually legitimates them for all purposes. The law remained substantially in this condition until March 3, 1887, when the act of Congress known as the Edmunds-Tucker law, 24 Stat. 635, c. 397, was passed, the 11th section of which provides that "the laws enacted by the legislative assembly of the Territory of Utah which provide for or recognize the capacity of illegitimate children to inherit, or to be entitled to any distributive share in, the estate of the father of any such illegitimate child, are hereby disapproved and annulled; and no illegitimate child shall hereafter be entitled to inherit from his or her father, or to receive any distributive share in the estate of his or her father: *Provided*, That this section shall not apply to any illegitimate child born within twelve months after the passage of this act, nor to any child made legitimate by the 7th section of the act " of 1882.

Here, then, is the first clear and unqualified declaration of Congress of its disapproval of the legislation of Utah recognizing the inheritable capacity of the issue of polygamous marriages; and so careful is Congress of rights acquired or existing under these laws that it excepts by special proviso all children declared to be legitimate by the 7th section of the act of 1882, as well as all illegitimate children born within twelve months after the passage of this act.

These several acts of Congress, dealing as they do with the same subject matter, should be construed not only as expressing the intention of Congress at the dates the several acts were passed, but the later acts should also be regarded as legislative interpretations of the prior ones. *United States* v. *Freeman*, 3 How. 556, 564; *Stockdale* v. *Insurance Co.*, 20

Wall. 323.   Now if it had been intended by the act of 1862 to annul the Territorial act of 1852, fixing the inheritable capacity of illegitimate children, why did Congress in 1882 recognize the legitimacy of children born of polygamous or Mormon marriages, prior to January 1, 1883?   Or why, in the act of 1887, did it save the rights of such children as well as of all others born within twelve months after the passage of that act?   The object of these enactments is entirely clear. Not only does Congress refrain from adding to the odium which popular opinion visits upon this innocent but unfortunate class of children, but it makes them the special object of its solicitude, and at the same time offers to the parents an inducement, in the nature of a *locus penitentiæ*, to discontinue their unlawful cohabitation.

Our conclusion is that the appellant George A. Cope is entitled to share in his father's estate, and the decree of the Supreme Court of the Territory must, therefore, be

*Reversed.*